BARROW v CITY OF DETROIT ELECTION COMMISSION

Docket No. 316695. Submitted June 17, 2013, at Detroit. Decided June 18, 2013, at 9:20 a.m.

Tom Barrow, a candidate for the position of Mayor of Detroit in the August 2013 primary election, brought an action for mandamus in the Wayne Circuit Court, Lita M. Popke, J., seeking a declaratory judgment that Michael Duggan was ineligible to appear on the August 2013 primary ballot for the same position because he failed to comply with certain provisions of the Detroit City Charter that required Duggan to be a resident and a registered voter for one year at the time of filing for office. Named as defendants were the City of Detroit Election Commission and the city clerk. The Election Commission had decided that Duggan had fulfilled the charter requirements, apparently because he had been a registered voter in Detroit for one year before the filing deadline applicable to all candidates, although he had filed 10 days before the one-year anniversary of his registering to vote. The court allowed Duggan and the Michael Duggan for Mayor Committee to intervene as defendants. The court ruled that defendants had a clear legal duty to determine whether Duggan met the charter's requirements on the date he filed the nominating petitions, not the filing deadline. The court held that the one-year residency requirement was not unconstitutional per se and concluded that there were multiple bases upon which the requirement could be construed as constitutional. The court entered an order granting declaratory relief, declaring that Duggan was ineligible to be listed as a candidate, and directing defendants to remove Duggan's name from the list of eligible candidates on the ballot. Intervening defendants appealed.

The Court of Appeals held:

1. Plaintiff established that mandamus is the proper method of raising his legal challenge to Duggan's candidacy. Plaintiff established his entitlement to a writ of mandamus.

2. The use of the phrase "the time of filing" in Detroit City Charter § 2-101 contemplates only one time, the time a particular candidate files for office.

3. No language within § 2-101 allows substantial compliance with the time period requirement. The doctrine of substantial

compliance is not applicable in this matter. A plain reading of the relevant provisions of the charter does not lead to an absurd result.

4. The plain and unambiguous language of the charter requires a candidate to be a resident and a registered voter of Detroit for one year before filing for office. It is undisputed that Duggan was not.

5. The United States Supreme Court has expressly disclaimed the idea that states cannot impose durational residency requirements.

6. Strict scrutiny does not apply to this case. The compelling-state-interest test is inappropriate here. It does not matter whether intermediate or rational basis review is utilized in this case because under intermediate scrutiny (and thus rational basis as well) the charter provisions survive constitutional scrutiny.

7. The governmental interests asserted in support of the durational residency requirements support the charter's requirement that candidates must be registered voters for one year when filing for office.

8. The charter does not require a citizen to choose between travel and the basic right to vote, and there is no basic right to candidacy. Although Duggan is penalized because he may not run for mayor for a year after registering to vote, his right to travel was not infringed and his candidacy is not a fundamental right.

9. Dugan did not meet the qualifications for inclusion of his name on the ballot under the plain language of the charter. The durational residency requirement neither implicates nor violates the constitutionally based right to travel.

Affirmed.

STEPHENS, P.J., concurring in part and dissenting in part, concurred with the majority in all respects with regard to Duggan's nonconstitutional arguments but dissented from the conclusion that the charter's durational residency requirements are constitutional. The trial court's opinion and order should be reversed and Duggan's name should be placed on the ballot because the charter's durational residency requirements impermissibly classify Duggan and other candidates on the basis of the candidate's exercise of the fundamental right to travel. Sections 2-101 and 3-111 of the charter are subject to strict scrutiny. Application of strict scrutiny to statutes that impede intrastate and interstate travel is appropriate. The charter's durational residency requirements are not narrowly tailored to serve a compelling governmental interest.

1. ELECTIONS — WORDS AND PHRASES — DETROIT CITY CHARTER — MUST — AT THE TIME OF FILING FOR OFFICE.

The language of § 2-101 of the Detroit City Charter that specifies that a person seeking elective office "must" be a registered voter of the city for one year "at the time of filing for office" contemplates only one time: the time a particular candidate files for office; the charter's use of the term "must" denotes that the conditions of the provision are mandatory, therefore precluding application of the doctrine of substantial compliance when analyzing whether the procedural requirements of the charter have been met.

2. CONSTITUTIONAL LAW — BALLOT ACCESS RESTRICTIONS.

Questions related to ballot access restrictions do not automatically require heightened equal protection scrutiny.

3. CONSTITUTIONAL LAW — RIGHT TO TRAVEL.

A state law implicates the right to travel when it actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right to travel.

4. CONSTITUTIONAL LAW — RIGHT TO TRAVEL — DETROIT CITY CHARTER.

Detroit City Charter § 2-101 does not penalize the exercise of the right to travel; the provision does not sufficiently infringe upon the right to travel to such an extent that strict scrutiny analyses must be applied to the provision.

5. ELECTIONS — DURATIONAL RESIDENCY REQUIREMENTS — STATE INTERESTS — DETROIT CITY CHARTER.

Durational residency requirements for candidates for elective office serve the principal state interests of ensuring that a candidate is familiar with his or her constituency, ensuring that the voters have been thoroughly exposed to the candidate, and preventing political carpetbagging; these interests support the requirement of Detroit City Charter § 2-101 that candidates for elective office must be registered voters for one year when filing for office.

6. CONSTITUTIONAL LAW — ELECTIONS — RIGHT TO CANDIDACY.

The right to candidacy for elective office is not a fundamental right.

*Andrew A. Paterson* for plaintiff.

*Melvin Butch Hollowell, Esq, PC* (by *Melvin Butch Hollowell*), *Bodman, PLC* (by *Thomas P. Bruetsch*), and

*Honigman Miller Schwartz & Cohn* (by *John D. Pirich* and *Andrea L. Hansen*) for the intervening defendants.

Before: STEPHENS, P.J., and TALBOT and MURRAY, JJ.

MURRAY, J. Intervening defendants-appellants, Michael Duggan and the Michael Duggan for Mayor Committee, appeal as of right an order granting declaratory relief in regard to plaintiff's complaint for mandamus, declaring that Duggan was ineligible to be a candidate for the position of Mayor of Detroit, and directing that defendants, City of Detroit Election Commission and Detroit City Clerk Janice Winfrey, remove his name from the list of eligible names to run in the August 2013 primary election for mayor. We affirm.

## I. BACKGROUND

This case concerns whether Michael Duggan is eligible to be placed on the primary ballot for mayor under the City of Detroit's Charter, which requires that a candidate for mayor be a resident and a registered voter for one year "at the time of filing for office . . . ." The material facts are undisputed. Duggan, formerly of Livonia, moved to Detroit in March 2012. Duggan registered to vote in Detroit on April 12, 2012. Duggan filed his nominating petitions with the requisite number of signatures for the August mayoral primary on April 2, 2013.

Plaintiff Tom Barrow, himself a candidate for the mayoral election, thereafter contacted Detroit City Clerk Janice Winfrey, challenging whether Duggan met the residency requirements set forth in the Detroit City Charter to be placed on the ballot. At issue was Detroit City Charter § 2-101, "Qualifications for Elective Officers and Appointive Officers," which provides, in pertinent part:

A person seeking elective office must be a citizen of the United States, a resident and a qualified and registered voter of the City of Detroit for one (1) year at the time of filing for office, and retain that status throughout their tenure in any such elective office.

The above provision applies to persons seeking election as mayor pursuant to charter provision § 2-105(A)(13) (defining "elective officers" to include the Mayor of Detroit, among others).

Plaintiff contended that Duggan had not been a registered voter in Detroit for one year before the filing of his petitions on April 2, 2013. Duggan countered that he had been a registered voter in Detroit for one year before the mayoral primary filing deadline, which was May 14, 2013. It is undisputed that had Duggan filed his petitions on or after April 12, 2013, he would have met the durational voter registration requirement.

The three-member Detroit Election Commission, comprised of Winfrey, Detroit City Council President Charles Pugh, and Acting Corporation Counsel Edward Keelean, met to certify the names of candidates for placement on the ballot for the August 2013 primary election in accordance with their statutory duties under MCL 168.323[1] and MCL 168.719.[2] On May 23, 2013, a divided Election Commission decided that Duggan fulfilled the charter requirements to file for office. Voting to certify were Winfrey and Keelean, apparently on the basis that Duggan was qualified because he had been a registered voter in Detroit for

[1] MCL 168.323 provides, in relevant part, that "[i]t shall be the duty of the board of city election commissioners to prepare the primary ballots to be used by the electors."

[2] In pertinent part, MCL 168.719 provides that "[t]he election commission of each city, township and village shall perform such duties relative to the preparation, printing and delivery of ballots as are required by law of the boards of election commissioners of counties."

one year before the filing deadline applicable to all candidates. Pugh dissented.

Plaintiff then brought an action for mandamus in circuit court, seeking a declaratory judgment that Duggan was ineligible to appear on the ballot because he did not comply with the charter. Plaintiff argued that because Duggan had not been a registered voter in Detroit for one year at the time he filed his petitions to run for mayor, his name should not be placed on the August ballot. Plaintiff also moved for injunctive relief.

Duggan answered that mandamus was inappropriate. He contended that in instances of technical defects, access to the ballot should be granted, particularly if absurd results would otherwise occur. He also maintained that the durational residency requirement was unconstitutional.

Defendants asserted that the circuit court should give deference to the Detroit Election Commission's interpretation of the charter. Defendants averred that Michigan caselaw was inconclusive regarding durational residency requirements for candidates. Finally, defendants urged the court to apply the doctrine of substantial compliance.

In a thorough and well-written opinion, the circuit court decided that the language of § 2-101 was plain and unambiguous and, utilizing the common meaning of the terms, opined that the phrase "at the time of filing for office" meant the "specific point in time when the candidate has delivered his or her non-partisan nomination petitions and affidavit of identity to the City Clerk." The court ruled that defendants had a clear legal duty to determine whether Duggan met the qualifications for inclusion of his name on the ballot on April

2, 2013, the date he filed his nominating petitions, not the date of the filing deadline.

With regard to Duggan's constitutional arguments, the circuit court ruled that the cases he cited were distinguishable and therefore were not binding. The court cited federal caselaw and observed that rarely has a one-year residency requirement been struck down. The court ruled that the charter's one-year residency requirement was not unconstitutional per se and concluded that there were multiple bases upon which the provision could be construed as constitutional.

On appeal, Duggan argues that the language of the Detroit City Charter, which he claims is poorly drafted, is ambiguous. Thus, the Election Commission did not have a clear legal duty to conclude that he was not qualified. Duggan calculates his one-year residency requirement from the petitions' filing deadline, May 14, 2013. He contends that he was a resident of Detroit and a registered voter since at least May 14, 2012, such that the Election Commission was correct in certifying him. Further, any ambiguity on this point should weigh in favor of access to the ballot and letting the electorate decide the issue, particularly where he merely filed his petitions early. Had he waited until the filing deadline, this issue would be moot. He adds that the charter's durational residency requirements are unconstitutional under a strict scrutiny standard.

Plaintiff answers that the language of § 2-101 is clear and unambiguous and provides that Duggan must have been a registered voter in Detroit for at least one year at the time he filed for office. To accept Duggan's reading of § 2-101 would require this Court to substitute "by the filing deadline" for "at the time of filing for office," an unwarranted reading of the plain words of the charter.

Further, plaintiff asserts that the circuit court correctly determined that § 2-101 was constitutional.

## II. ANALYSIS

### A. STANDARD OF REVIEW

The issues presented are subject to review de novo. Courts review questions of law under a de novo standard. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). Specifically, in a mandamus action this Court reviews de novo as questions of law whether a defendant has a clear legal duty to perform and whether a plaintiff has a clear legal right to performance. See *In re MCI Telecom Complaint*, 460 Mich 396, 442-443; 596 NW2d 164 (1999).[3] As in other cases, in a declaratory judgment action this Court reviews de novo a trial court's decision regarding a motion for summary decision. See *Mich Ed Employees Mut Ins Co v Turow*, 242 Mich App 112, 114; 617 NW2d 725 (2000). The interpretation of a city charter provision is a question of law. *In re Storm*, 204 Mich App 323, 325; 514 NW2d 538 (1994), overruled in part on other grounds *Detroit Police Officers Ass'n v Detroit*, 452 Mich 339, 342 n 2 (1996). Constitutional issues also receive review de novo. *Sidun v Wayne Co Treasurer*, 481 Mich 503, 508; 751 NW2d 453 (2008).

### B. MANDAMUS

Duggan challenges the grant of mandamus to plaintiff. A plaintiff has the burden of establishing entitle-

---

[3] See also *Rhode v Dep't of Corrections*, 227 Mich App 174, 178; 578 NW2d 320 (1997) (ruling that review of a decision on a writ of mandamus is for an abuse of discretion except where the central issue in the appeal involves statutory interpretation, and that question of law is reviewed de novo).

ment to the extraordinary remedy of a writ of mandamus. *Lansing Sch Ed Ass'n v Lansing Bd of Ed (On Remand)*, 293 Mich App 506, 519-520; 810 NW2d 95 (2011). The plaintiff must show that (1) the plaintiff has a clear legal right to the performance of the duty sought to be compelled, (2) the defendant has a clear legal duty to perform such act, (3) the act is ministerial in nature such that it involves no discretion or judgment, and (4) the plaintiff has no other adequate legal or equitable remedy. *Vorva v Plymouth-Canton Community Sch Dist*, 230 Mich App 651, 655-656; 584 NW2d 743 (1998).

It is undisputed that defendants have the statutory duty to submit the names of the eligible candidates for the primary election, see MCL 168.323 and MCL 168.719. The inclusion or exclusion of a name on a ballot is ministerial in nature. Here, plaintiff himself is a candidate for mayor, as well as a citizen of Detroit. Aside from the instant action, plaintiff has no other adequate legal remedy, particularly given that the election is mere weeks away and the ballot printing deadline is imminent. Plaintiff thus has established that mandamus is the proper method of raising his legal challenge to Duggan's candidacy. See, generally, *Sullivan v Secretary of State*, 373 Mich 627; 130 NW2d 392 (1964); *Wojcinski v State Bd of Canvassers*, 347 Mich 573; 81 NW2d 390 (1957).

The circuit court accepted plaintiff's challenges to Duggan's candidacy, thus, plaintiff established his entitlement to a writ of mandamus. Upon review, if we in turn likewise determine that Duggan did not meet the qualifications to be a candidate for elected office under the charter, plaintiff would have a clear legal right to have Duggan's name removed from the list of candidates, the Election Commission would have a clear legal duty to remove Duggan's name, the act would be

ministerial because it would not require the exercise of judgment or discretion, and plaintiff would have no other legal or equitable remedy. See *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273, 291-292; 761 NW2d 210 (2008), aff'd in result only 482 Mich 960 (2008). Accordingly, we must consider whether Duggan complied with the charter provisions to establish his qualifications to be among the candidates for mayor.

### C. CHARTER LANGUAGE

Michigan statutory law provides that a city's charter governs qualifications for persons running for office, MCL 168.321(1).[4] As noted, the Detroit City Charter sets forth qualifications to be a candidate for elective office in § 2-101, which specifies that a "person seeking elective office must be a . . . registered voter of the City of Detroit for one (1) year *at the time of filing for office* . . . ." (Emphasis added.) Plaintiff argues, and the circuit court determined, that the emphasized language means that a candidate must be a registered voter one year prior to filing his or her papers for office, while Duggan argues that the phrase refers to the filing deadline applicable to all candidates.

To support his position, Duggan argues that the phrase "at the time of filing for office" in § 2-101 is ambiguous. When reviewing the provisions of a home rule city charter, we apply the same rules that we apply to the construction of statutes. *Detroit v Walker*, 445 Mich 682, 691; 520 NW2d 135 (1994). The provisions are to be read in context, with the plain and ordinary

---

[4] MCL 168.321(1)provides: "Except as provided in subsection (3) and sections 327, 641, 642, and 644g, the qualifications, nomination, election, appointment, term of office, and removal from office of a city officer shall be in accordance with the charter provisions governing the city."

meaning given to every word. *Driver v Naini*, 490 Mich
239, 247; 802 NW2d 311 (2011). Judicial construction is
not permitted when the language is clear and unam-
biguous. *Id*. Courts apply unambiguous statutes as
written. *Id*.

Alternately, when we "interpret" a statute, the pri-
mary goal must be to ascertain and give effect to the
drafter's intent, and the judiciary should presume that
the drafter intended a statute to have the meaning that
it clearly expresses. *Klooster v City of Charlevoix*, 488
Mich 289, 296; 795 NW2d 578 (2011). This Court
determines intent by examining the language used.
*United States Fidelity & Guaranty Co v Mich Cata-
strophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 13;
795 NW2d 101 (2009).

At issue here is the phrase "at the time of filing for
office." Notably, the charter employed the term "the,"
rather than the term "a," to modify the noun "time." As
explained by our Supreme Court, the terms "the" and
"a" have distinct functions:

> "The" and "a" have different meanings. "The" is de-
> fined as "definite article. 1. (used, esp. before a noun, with
> a specifying or particularizing effect, as opposed to the
> indefinite or generalizing force of the indefinite article a or
> an). . . ." *Random House Webster's College Dictionary*,
> p 1382. [*Massey v Mandell*, 462 Mich 375, 382 n 5; 614
> NW2d 70 (2000).]

Where the Legislature wishes to refer to a particular
item, not a general item, it uses the word "the," rather
than "a" or "an." See *Johnson v Detroit Edison Co*, 288
Mich App 688, 699; 795 NW2d 161 (2010). The charter's
use of "the time of filing," with "the" being a definite
article and "time" being a singular noun, contemplates
only one time. That time is unquestionably the time a
particular candidate files for office. The language of the

charter could not be any more clear or unambiguous.[5] And, Duggan does not dispute that he filed his nominating petitions on April 2, 2013, which was less than one year from the date he registered to vote.

Duggan argues, however, that the phrase could be interpreted as referring to the deadline for filing nominating petitions. The difficulty with that argument is the actual language of the charter, which does not contain the term deadline. To accept Duggan's argument would require this Court to add the word "deadline" to the charter, but we must instead adhere to our limited constitutional role and refrain from adding language that the drafters neither included nor intended. *Burise v City of Pontiac*, 282 Mich App 646, 654; 766 NW2d 311 (2009). We may not assume that the drafters inadvertently made use of one word or phrase instead of another. *Detroit v Redford Twp*, 253 Mich 453, 456; 235 NW 217 (1931).

The "substantial compliance" doctrine as enunciated in *Meridian Charter Twp v East Lansing*, 101 Mich App 805, 810; 300 NW2d 703 (1980), does not affect our analysis of the charter provision. Under the substantial compliance doctrine, " '[a]s a general principle, all doubts as to technical deficiencies or failure to comply with the exact letter of procedural requirements are resolved in favor of permitting the people to vote and express their will on any proposal subject to election.' " *Bloomfield Charter Twp v Oakland Co Clerk*, 253 Mich

---

[5] In other contexts this Court has held that an individual becomes a candidate on the date he or she files for election to office. *Okros v Myslakowski*, 67 Mich App 397, 401; 241 NW2d 223 (1976), citing *Grand Rapids v Harper*, 32 Mich App 324, 329-330; 188 NW2d 668 (1971). This Court more recently adopted that precept in *Gallagher v Keefe*, 232 Mich App 363, 373-374; 591 NW2d 297 (1998), when ruling that the defendant's eligibility for county commissioner was "determined as of the date that the candidate files for election to the office . . . ."

App 1, 21; 654 NW2d 610 (2002), quoting *Meridian Twp*, 101 Mich App at 810. However, in *Stand Up For Democracy v Secretary of State*, 492 Mich 588, 594; 822 NW2d 159 (2012), our Supreme Court overruled *Bloomfield Charter Twp*. In *Stand Up*, the Court reviewed the certification of petitions under a statute that used the mandatory term "shall." The Court decided that, where the statute did not, by its plain terms, permit the certification of deficient petitions, the doctrine of substantial compliance did not apply. Here, the charter provision's use of the term "must," like the term "shall," denotes that the conditions following it are mandatory. See *In re Kostin Estate*, 278 Mich App 47, 57; 748 NW2d 583 (2008). There is also no language within the charter provision at issue that allows for substantial compliance with the time period requirement. We therefore are precluded from applying the doctrine of substantial compliance in this matter.

We reject the notion that a plain reading of the charter language leads to an absurd result. Under the absurd-results rule, "a statute should be construed to avoid absurd results that are manifestly inconsistent with legislative intent . . . ." *Detroit Int'l Bridge Co v Commodities Export Co*, 279 Mich App 662, 674; 760 NW2d 565 (2008) (quotation marks and citation omitted). Our Supreme Court, however, has commented that the absurd results "rule" of construction typically is merely " ' "an invitation to judicial lawmaking." ' " *Casco Twp v Secretary of State*, 472 Mich 566, 603; 701 NW2d 102 (2005) (YOUNG, J., concurring in part and dissenting in part) (citation omitted). Justice YOUNG added that the role of the Court was not to rewrite the law to obtain a more "logical" or "palatable" result, but instead was to give effect to the Legislature's intent by enforcing the provision as it was written. *Id*. Enforcing the charter provision as it was drafted does not end in

an absurd result. Rather, it is the logical outcome expected from application of the clear, straightforward charter language, and is much like enforcing a statute of limitations when a party has missed the statutory deadline by 10 days. It is done not infrequently in Michigan courts because there is no "wiggle room" when applying a clear and definite time period to an undisputed set of facts. Consequently, to be eligible to be placed on the ballot, a candidate must have been a registered voter in Detroit for one year before filing his or her petitions.

Duggan also raises charter provision § 3-111, "Residency Requirement for Elective Officers," which requires that candidates must have resided in the city for one year at the time of filing:

1. *Elected Officials Generally.*

All candidates for elective office and elected officials shall be bona fide residents of the City of Detroit and must maintain their principal residence in the City of Detroit for one (1) year at the time of filing for office or appointment to office, and throughout their tenure in office.

This residency provision of the charter is not dispositive to our analysis or conclusion, though we note that it reinforces the plain language of 2-101 that a candidate be a Detroit resident for one year at the time of filing for office.

For the reasons expressed, the plain and unambiguous language of the charter requires a candidate to be a registered voter of Detroit one year prior to filing for office. As noted, it is undisputed that Duggan was not. Hence, unless there is some independent impediment to enforcing this charter provision against Duggan, he is ineligible to be placed on the ballot for mayor in the August 2013 primary.

D. CONSTITUTIONAL ISSUES

Duggan argues that the durational voter registration requirement of the charter provision violates his equal protection rights under our state Constitution. Const 1963, art 1, § 2. However, the Equal Protection Clauses of the United States and Michigan Constitutions are coextensive. *Harvey v Michigan*, 469 Mich 1, 6; 664 NW2d 767 (2003). The right to *intra*state travel under the Michigan Constitution was abruptly declared in *Musto v Redford Twp*, 137 Mich App 30, 34 & n 1; 357 NW2d 791 (1984), which cited our state's parallel provision to the United States Constitution: "No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation." Const 1963, art 1, § 2.[6]

At the outset, we observe that the United States Supreme Court has noted that it has "expressly disclaimed" the idea that states cannot impose durational residency requirements. *Sosna v Iowa*, 419 US 393, 406; 95 S Ct 553; 42 L Ed 2d 532 (1975). Indeed, the United States Constitution imposes durational residency requirements on representatives (7 years), senators (9 years) and presidents (14 years), US Const, art I, § 2, cl 2; art I, § 3, cl 3; and art II, § 1, cl 5. Our own state Constitution requires that the Governor be "a regis-

---

[6] Duggan also discusses, in passing, infringement on the right to vote and the First Amendment rights of freedom of speech and association. However, he merely mentions those rights in a single footnote. Appellants may not give cursory treatment to issues, *VanderWerp v Plainfield Charter Twp*, 278 Mich App 624, 633; 752 NW2d 479 (2008), and by doing so, Duggan has abandoned a constitutional challenge under the First Amendment or the right to vote. *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 406; 651 NW2d 756 (2002).

tered elector in this state for four years . . . ." Const 1963, art 5, § 22. Accordingly, all durational residency requirements are not unconstitutional, a proposition that was not clear at the time we decided *Grano v Ortisi*, 86 Mich App 482; 272 NW2d 693 (1978).

In undertaking constitutional analysis, we are mindful—as was the circuit court—that legislation challenged on equal protection grounds is presumed constitutional and the challenger has the burden to rebut that presumption. *Boulton v Fenton Twp*, 272 Mich App 456, 467; 726 NW2d 733 (2006). Courts examine three factors when determining whether a law violates the Equal Protection Clause: "the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." *Dunn v Blumstein*, 405 US 330, 335; 92 S Ct 995; 31 L Ed 2d 274 (1972).

When evaluating an equal protection challenge to a provision, courts apply one of three traditional levels of review.[7] *Heidelberg Bldg, LLC v Dep't of Treasury*, 270 Mich App 12, 18; 714 NW2d 664 (2006). Traditionally, the rational basis test applies where no suspect factors are present or where no fundamental right is implicated. *Kyser v Kasson Twp*, 486 Mich 514, 522 n 2; 786 NW2d 543 (2010). Under this test, a statute is constitutional if it furthers a legitimate governmental interest and if the challenged statute is rationally related to

---

[7] Those standards include strict scrutiny, intermediate scrutiny, and rational basis. To pass intermediate scrutiny, a law must be substantially related to an important governmental interest. *Clark v Jeter*, 486 US 456, 461; 108 S Ct 1910; 100 L Ed 2d 465 (1988); *Phillips v Mirac, Inc*, 470 Mich 415, 433; 685 NW2d 174 (2004). In other words, the challenged law must be found reasonably necessary to the accomplishment of the state's legitimate election interests. *Lubin v Panish*, 415 US 709, 718; 94 S Ct 1315; 39 L Ed 2d 702 (1974).

achieving that interest. *Boulton*, 272 Mich App at 467. Thus, restrictions are set aside only if they are based on reasons unrelated to the state's goals and no grounds can be conceived to justify them.

The most heightened review, strict scrutiny, applies when the provision interferes with a fundamental right or classifies based on factors that are suspect, such as race, national origin, or ethnicity. *Rose v Stokely*, 258 Mich App 283, 300; 673 NW2d 413 (2003). Under a strict scrutiny analysis, the government may not infringe upon a fundamental liberty interest unless the infringement is narrowly tailored to serve a compelling state interest. *In re B & J*, 279 Mich App 12, 22; 756 NW2d 234 (2008).

In *Grano* we held that strict scrutiny applied to an equal protection challenge to a two-year durational residency requirement. The decision to employ strict scrutiny was largely premised upon federal caselaw, in particular *Green v McKeon*, 468 F2d 883 (CA 6, 1972). We are not bound by *Grano*, a pre-1990 decision, and we conclude it improperly employed the strict scrutiny standard of review.[8] *Green* was disavowed by the United States Court of Appeals for the Sixth Circuit long ago, and is no longer considered controlling precedent, see *City of Akron v Bell*, 660 F2d 166, 169 (CA 6, 1981).[9] Additionally, for reasons the Court did not explain, *Grano* chose not to follow the two decisions issued by the United States Supreme Court summarily affirming

---

[8] Under MCR 7.215(J)(1), panels must follow this Court's published decisions issued on or after November 1, 1990.

[9] Additionally, *Green* relied on *Dunn* for its conclusion that the right to travel was penalized, but *Dunn* involved the right to travel of the voting populace, not a perspective candidate's right to travel, and, as we have observed, there is no constitutional right to candidacy. The difference between what was involved in *Dunn* and what was involved in *Green* is constitutionally significant.

durational residency requirements, *Chimento v Stark*, 353 F Supp 1211 (D NH, 1973), aff'd 414 US 802 (1973), and *Sununu v Stark*, 383 F Supp 1287 (D NH, 1974), aff'd 420 US 958 (1975). Yet it was in large part those Supreme Court decisions, along with *Bullock v Carter*, 405 US 134; 92 S Ct 849; 31 L Ed 2d 92 (1972), that the federal courts took as signifying a change in the legal landscape for these durational residency challenges. See, e.g., *Bell*, 660 F2d at 168-169; *Joseph v City of Birmingham*, 510 F Supp 1319, 1329-1330 (ED Mich, 1981); *In re Contest of November 8, 2011 General Election*, 210 NJ 29, 53; 40 A3d 684 (2012). For those reasons, we do not follow *Grano*. Duggan also relies on *Musto*, 137 Mich App at 34, but that case is distinguishable because it did not involve a durational residency requirement for candidates for elective office.

Caselaw since *Grano* compels a conclusion that strict scrutiny does not apply to this case.[10] Notably, questions related to ballot access restrictions do not automatically require "heightened" equal protection scrutiny. *Erard v Johnson*, 905 F Supp 2d 782, 798 (ED Mich, 2012). Residency is also not one of the suspect classifications, *Crego v Coleman*, 463 Mich 248, 259; 615 NW2d 218

---

[10] Our decision to question and not follow *Grano*'s use of a strict scrutiny test under these circumstances does not require prospective application. Court decisions are almost always applied retroactively. *In re Hill*, 221 Mich App 683, 690; 562 NW2d 254 (1997). Additionally, when they are not—or when cases that are wrongly decided are not reversed—it is typically because of reliance factors that are not at issue here. *Joseph v Auto Club Insurance Ass'n*, 491 Mich 200, 219-220; 815 NW2d 412 (2012). For one, the charter provision has never been declared unconstitutional, and thus there could be no reliance that the provision would not be applied. Second, the charter provision is crystal clear, and it is the consistency of enforcing that clear language that reinforces reliance on the laws established by the lawmaking branches of government. *Robinson v Detroit*, 462 Mich 439, 467-468; 613 NW2d 307 (2000). Third, Duggan relied on the charter provision when filing for office; he did not make a blanket challenge to the provision's constitutionality.

(2000), so our review is confined to whether the charter provision impedes a fundamental right.[11] With regard to the character of the classification and the individual interests affected, the alleged infringement of the right to travel in this case relates to Duggan's move from Livonia to Detroit.[12] A state law implicates the right to travel when it actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right. *Attorney General of New York v Soto-Lopez*, 476 US 898, 903; 106 S Ct 2317; 90 L Ed 2d 899 (1986).

We find that the charter provision will have a minor effect, if any, on intrastate travel, as it applies only to individuals who wish to run for elected office as described in charter § 2-105(A)(13). It does not prohibit anyone from moving into or out of Detroit, and was not designed to discourage intrastate travel. Rather, according to the charter's commentary to § 2-101, it was meant to "make[] it more likely that elected officials will be intimately familiar with the unique issues impacting their communities." We also consider that "the benefit denied is not itself a fundamental right (such as voting) nor a basic necessity of life (such as welfare benefits for the poor) . . . ." *Bell,* 660 F2d at 169. The charter provision thus does not "penalize" the exercise of the right to travel, it merely places an insignificant impediment to *running for office* once moving into the city. The charter provision does not sufficiently infringe upon the right to travel such that strict scrutiny must be applied. See *Mem Hosp v Maricopa Co*, 415 US 250, 256-262; 94 S Ct 1076; 39 L Ed 2d 306 (1974) (considering the right to travel in the context of "vital" government benefits).

---

[11] Note that there is no fundamental right to candidacy. *Bullock*, 405 US 134; *Carver v Dennis*, 104 F3d 847, 850-851 (CA 6, 1997).

[12] Interstate travel is not involved in this case.

Accordingly, the compelling-state-interest test is inappropriate here. See *In re Contest of November 8, 2011 General Election*, 210 NJ at 53 ("Since the Supreme Court's decision in *Bullock*, there has been general consensus that strict scrutiny should not apply to requirements that candidates live in a district or municipality for a particular duration."). Indeed, since *Bullock* "courts that have applied strict scrutiny to durational residency requirements have done so only when those requirements imposed a burden on the right to interstate travel and have based the strict scrutiny analysis on that interference, not on the requirement's asserted interference with the right to run for office." *Id.* at 54. As such, strict scrutiny does not apply and we must apply either intermediate or rational basis review to the durational voter registration requirement.[13] In the end, however, it does not matter which is utilized, for under intermediate scrutiny (and thus rational basis as well) the charter provision survives constitutional scrutiny. See *Bell*, 660 F2d at 169 (upholding one-year durational residency provision under intermediate scrutiny); *Joseph*, 510 F Supp at 1333 (upholding one-year durational residency provision under rational basis); *In re Contest of November 8, 2011 General Election*, 210 NJ at 53 (collecting cases and upholding a one-year durational residency provision under intermediate scrutiny).[14]

---

[13] This conclusion finds support from the United States Supreme Court, which specifically stated that "insignificant interference" with ballot access need have only a rational predicate to survive an equal protection challenge. *Clements v Fashing*, 457 US 957, 968; 102 S Ct 2836; 73 L Ed 2d 508 (1982) (plurality opinion) (the Court referencing its upholding of a seven-year durational residency requirement in *Chimento v Stark*, 414 US 802; 94 S Ct 125; 38 L Ed 2d 39 [1973], summarily aff'g 353 F Supp 1211 [D NH, 1973]).

[14] We offer a couple of points to the dissent. First, we do not doubt that there is a right to travel protected by the state Constitution, as was

We now turn to the governmental interests asserted in support. Aside from the language in the charter commentary, we consider that durational residency requirements serve three principal state interests: " 'first, to ensure that the candidate is familiar with his constituency; second, to ensure that the voters have been thoroughly exposed to the candidate; and third, to prevent political carpetbagging[.]' " *Lewis v Guadagno*, 837 F Supp 2d 404, 414 (D NJ, 2011) (citation omitted). Stated differently, the significant governmental interests include:

> (1) the interest in exposing candidates to the scrutiny of the electorate, so voters may make informed choices; (2) the interest in protecting the community from outsiders who are interested only in their own selfish ends and not seriously committed to the community; and (3) the interest in having officeholders who are familiar with the problems, interests, and feelings of the community. [*Joseph*, 510 F Supp at 1336.]

These justifications—which were in part cited by the city in establishing the provision—support the charter's requirement that candidates must be registered voters for one year when filing for office. We further observe that the people of Detroit recently considered the durational residency requirement when adopting the latest

---

declared in *Musto*. But, that does not automatically result in a strict scrutiny analysis, as the question to answer is whether the charter penalizes Duggan from exercising a fundamental right, and seeking public office is not one. See *Hankins v Hawaii*, 639 F Supp 1552, 1555 (D Hawaii, 1986); *Carver v Dennis*, 104 F3d 847, 850-851 (CA 6, 1997). Thus, the fact that strict scrutiny was applied in cases like *Gilson v Dep't of Treasury*, 215 Mich App 43; 544 NW2d 673 (1996), which did not involve a durational residency provision for public office, does not help an analysis of this case. Second, we are not the only court to conclude that the *Green* decision, though not reversed, is no longer persuasive or valid precedent on which to rely. See *Bell*, 660 F2d at 168 (Sixth Circuit called its own decision in *Green* "no longer controlling precedent"), and *Joseph*, 510 F Supp at 1327.

version of the charter in the November 2011 election and chose to include it.[15] The interests of the people in adopting the charter must be balanced with the interest of voters to have their choice of candidates. In this instance, the former need not give way to the latter where Duggan asserts that he may be a write-in candidate under state law, citing MCL 168.737a,[16] and there is no constitutional right to vote for an individual who did not meet the eligibility requirements to have their name placed on the ballot. Indeed, voters have the right to expect that the candidates appearing on ballots have met the requirements set by the citizens in the charter.

The substantial interest of the city in prescribing candidate eligibility requirements also weighs in favor of the charter provision. The United States Supreme Court indicated that the interests of the state of Texas in a durational residency requirement for elected officials were sufficient to warrant the "*de minimis*" interference with the individual's interests in candidacy. *Clements v Fashing*, 457 US 957, 971-972; 102 S Ct 2836; 73 L Ed 2d 508 (1982) (plurality opinion). The charter does not require a citizen to "choose between travel and the basic right to vote," see *Dunn*, 405 US at 342, because no analogous basic right to candidacy exists. Therefore, although Duggan is "penalized" in that he may not run for mayor for a year after registering to vote, his right to travel was not and his candidacy

---

[15] No durational residency requirement was contained in the 1997 Detroit City Charter.

[16] MCL 168.737a(1) provides, in pertinent part: "The write-in candidate shall file the declaration of intent to be a write-in candidate with the filing official for that elective office on or before 4 p.m. on the second Friday immediately before the election." Section 3-106 of the charter allows for state law to apply to the filing for office by candidates except as otherwise provided in the charter. Thus, the voters remain free to "cast their votes effectively." *Williams v Rhodes*, 393 US 23, 30; 89 S Ct 5; 21 L Ed 2d 24 (1968).

is not a fundamental right. See *Hankins v Hawaii*, 639 F Supp 1552, 1555 (D Hawaii, 1986).[17] Duggan points to no specific text in the parallel provisions of the Michigan Constitution to warrant a different result than in the federal cases.[18] He has not provided sufficient justification for this Court's intrusion into the charter adopted by the people of Detroit.

### III. CONCLUSION

We hold that Duggan has not met the qualifications for inclusion of his name of the ballot by the plain terms contained in the charter. We also hold that the durational residency requirement neither implicates, nor violates, the constitutionally based right to travel. Consequently, because Duggan has failed to meet the charter requirements, his name may not appear on the ballot. Plaintiff thus has a clear legal right to have Duggan's name removed from the list of candidates and the Election Commission has a clear legal duty to perform this ministerial act.

Affirmed. This opinion is given immediate effect pursuant to MCR 7.215(F)(2).

No costs, a public question being involved. MCR 7.219(A). We do not retain jurisdiction.

TALBOT, J., concurred with MURRAY, J.

---

[17] The *Hankins* court concluded: "The fact that, under the Constitution of the State of Hawaii, an individual must set aside his plans to become Governor for five years after moving to the State cannot seriously be said to constrict the freedom of interstate travel. This court finds that the relationship between the requirement at issue and the right to travel is " 'too attenuated to warrant invocation of the strict standard of scrutiny.' " *Id.* at 1555-1556 (citation omitted). The same is true in this case.

[18] We thus decline to adopt a more stringent standard than that adopted by the United States Supreme Court.

STEPHENS, P.J. (*concurring in part and dissenting in part*). I concur with the majority in all respects with regard to Duggan's nonconstitutional arguments. I write separately to respectfully dissent from the majority's conclusion regarding the constitutionality of the Detroit City Charter's durational residency requirements.[1] Consistent with both Michigan and federal caselaw, on the record that currently exists, I conclude that the durational residency requirements are unconstitutional. Accordingly, I would reverse the trial court and order that Duggan's name be placed on the ballot.

The right to travel from state to state and from county to county is a fundamental right. *Gilson v Dep't of Treasury*, 215 Mich App 43, 50; 544 NW2d 673 (1996) (interstate travel); *Grace v Detroit*, 760 F Supp 646, 651 (ED Mich, 1991) (intrastate travel). It is well established that classifications that are based upon the exercise of a fundamental right offend the Equal Protection Clauses of both the United States and the Michigan Constitutions, Const 1963, art 1 § 2; US Const, Am XIV. See *Doe v Dep't of Social Servs*, 439 Mich 650, 662; 487 NW2d 166 (1992). See also *Plyler v Doe*, 457 US 202, 216-217; 102 S Ct 2382; 72 L Ed 2d 786 (1982). The case cited by the majority to support their assertion that the Michigan equal protection standard is coextensive with the federal Equal Protection Clause, *Harvey v Michigan*, 469 Mich 1, 7; 664 NW2d 767 (2003), expressly adopted the strict scrutiny ana-

---

[1] Duggan has challenged the constitutionality of two portions of the Charter: §§ 2-101 and 3-111. I recognize that strictly speaking, § 2-101 is a voter registration requirement and not a durational residency requirement. However, in order to vote one must be a resident, and by imposing a one-year voter registration requirement, § 2-101 arguably imposes a de facto durational residency requirement. In any event, it is undisputed that § 3-111 by its express terms imposes a durational residency requirement of one year for prospective candidates for elected city office.

lytical framework for cases involving any suspect class or fundamental right. This Court has held:

> The constitutional guarantee of equal protection mandates that persons in similar circumstances be treated alike. In order to perform an equal protection analysis, we must first determine which constitutional test applies, strict scrutiny or the rational basis test. Because the right to interstate travel is a fundamental right, we will review a statute that penalizes the right to travel under the strict scrutiny test . . . . [*Gilson*, 215 Mich App at 49-50 (citations omitted).]

Generally speaking, if a law or regulation is determined to be subject to strict scrutiny, "the government bears the burden of establishing that the classification drawn is narrowly tailored to serve a compelling governmental interest." *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 319; 783 NW2d 695 (2010); *Gilson*, 215 Mich App at 50.

This Court has held in the past that durational residency requirements infringe on the right to travel and are therefore subject to strict scrutiny. In *Grano v Ortisi*, 86 Mich App 482, 495; 272 NW2d 693 (1978), a case strikingly similar to the one at bar, this Court rejected durational residency requirements for candidates seeking elected office. Durational residency requirements for applicants for nonelected public-sector employment were rebuffed in *Musto v Redford Twp*, 137 Mich App 30, 34; 357 NW2d 791 (1984). No distinction has been made between inter- and intrastate travel.

In *Grano*, 86 Mich App at 495, this Court concluded that a city's two-year residency requirement for candidates for municipal judgeships "substantially affect[s] the fundamental right of free travel . . . thus requiring [the government] to demonstrate that the provision

serves a compelling state interest." The *Grano* Court noted that durational residency requirements had been declared unconstitutional with regard to candidates for the office of city commissioner in Pontiac, *Alexander v Kammer*, 363 F Supp 324, 327 (ED Mich, 1973), and mayor in the city of Warren, *Bolanowski v Raich*, 330 F Supp 724, 731 (ED Mich, 1971). The *Grano* Court relied heavily on *Green v McKeon*, 468 F2d 883, 885 (CA 6, 1972).[2] In *Green*, the United States Court of Appeals for the Sixth Circuit concluded that a two-year residency requirement as a condition of eligibility to hold elective office in the city of Plymouth's charter was subject to strict scrutiny, and that the durational residency requirement was not narrowly tailored to a compelling government interest. *Id.* The *Grano* Court similarly determined that the city's justification for the municipal judgeship durational residency requirement, "to insure that candidates are knowledgeable about local procedures and laws and known to the electorate," was not compelling, and that even if it were, the durational residency requirement was not narrowly tailored to effectuate that interest. *Grano*, 86 Mich App at 495. Similarly, in *Musto*, 137 Mich App at 34, this Court relied on *Grano* to conclude that a state statute that imposed a requirement that applicants for local police and fire departments be residents of the locality for one year before applying was subject to strict scrutiny because it imposed "a penalty on the exercise of [the right to travel]." Similarly, in 1991, the United States District Court for the Eastern District of Michigan, relying not only on *Grano* and *Musto*, but on a number of federal right-to-travel cases, concluded that the requirement of the city of Detroit that applicants to the

---

[2] I disagree with the majority that *Green* is no longer good law upon which we can rely. It has never been reversed or vacated.

Detroit Police Department be residents of the city for 60 days before applying was subject to strict scrutiny under the Equal Protection Clauses of both the Michigan and the United States Constitutions, because the requirement classified applicants on the basis of their exercise of the right to travel. *Grace*, 760 F Supp at 651.

*Grano* and *Musto* are not unique. Any number of federal courts have reached the same conclusion—that durational residency requirements infringe on the right to travel and are therefore subject to strict scrutiny. See, e.g., *Westenfelder v Ferguson*, 998 F Supp 146, 151 (D RI, 1998) (durational residency requirement for welfare benefits); *Robertson v Bartels*, 150 F Supp 2d 691, 696 (D NJ, 2001), motion to intervene granted, motion to vacate order denied, motion to modify order granted 890 F Supp 2d 519 (2012) (durational residency requirement for elected office); *Walsh v City & Co of Honolulu*, 423 F Supp 2d 1094, 1101 (D Hawaii, 2006) (residency requirement to apply for public employment). Although I acknowledge that these cases are not binding on us, because the Michigan and federal Equal Protection Clauses are indeed coextensive, *Harvey*, 469 Mich at 6, they are nonetheless persuasive.

On the basis of *Grano* and *Musto* alone, I would conclude that §§ 2-101 and 3-111 of the Detroit City Charter are subject to strict scrutiny, rather than some lower standard of constitutional review. First, although I acknowledge that these cases predate November 1, 1990, and we are therefore not bound by them, MCR 7.215(J)(1), these cases have also never been overruled. I would not conclude that merely because these cases are old they are wrong. Rather, I would conclude that we should follow our prior cases, particularly when no contrary Michigan authority has arisen in the intervening years. Two post-1990 cases, *Gilson*, 215 Mich App at

50, and *People v Ghosh*, 188 Mich App 545, 547; 470 NW2d 497 (1991), reiterated that the application of strict scrutiny to statutes that impede intra- and interstate travel is appropriate. Moreover, I find the rationale of *Grano* and *Musto* persuasive. In those cases, the panels found that the very creation of separate classifications of persons based solely on whether they had exercised their right to travel either within a state or between states subjected that decision to strict scrutiny because it implicated a fundamental right. In that regard, there is no principled distinction between the residency requirements at issue in *Grano, Musto,* or *Grace,* and the provisions of the Detroit City Charter at issue in this case. The majority opines that the charter provision has only a minor effect on intrastate travel. In *Maldonado v Houstoun,* 177 FRD 311, 331 (ED Pa, 1997), citing *Mem Hosp v Maricopa Co,* 415 US 250, 256-257; 94 S Ct 1076; 39 L Ed 2d 306 (1974), the court rejected a durational residency requirement that deprived persons of some but not all welfare benefits, noting that the Supreme Court has never made clear the "amount of impact required to give rise to the compelling-state interest test . . . ." Even an unjustified minor impingement on a constitutional right is abhorrent to the law. I concede that in a hierarchy of rights and benefits the right to travel may pale against a liberty interest of an accused or need of a critically ill recipient of governmental health insurance. However, the right to travel inter- or intrastate remains one of the fundamental rights under the Michigan Constitution and is worthy of protection.

Because the challenged provisions of the Detroit City Charter are subject to strict scrutiny, it is defendants' burden to establish that the provisions are narrowly tailored to serve a compelling governmental interest. *Shepherd Montessori Ctr,* 486 Mich at 319. However,

defendants have not filed an appellate brief in the instant case.[3] I am therefore left to rely on the record below to glean what compelling interest defendants believe justifies the durational residency requirements here. Defendants cited the charter commentary in their circuit court brief. The commentary to § 2-101 states that "[r]equiring that candidates for elective office reside for a specified period of time in the community they seek to serve makes it more likely that elected officials will be intimately familiar with the unique issues impacting their communities."[4] Similarly, the commentary to § 3-111 states that the residency requirement "is a significant means of assuring that [candidates] have a demonstrable commitment to the City of Detroit and first-hand familiarity with issues confronting the City." Defendants relied on both these provisions in the circuit court; accordingly, it is reasonable to conclude that these are the governmental interests defendants believe justify the requirements. I disagree.

Even assuming, arguendo, that familiarity with the community and the issues confronting it is a compelling governmental interest; defendants have not established that the charter's residency and voter registration requirements are narrowly tailored to serve that interest. Indeed, the governmental interest asserted by de-

[3] Ordinarily, if a party bearing the burden of proof declined altogether to file an appellate brief in this Court, I would conclude on that basis alone that it had failed to meet its burden. However, given the unique circumstances of this case, particularly the expedited manner in which it has arrived at this Court; I am willing to conclude that while this Court would benefit from further briefing from defendants on the strict scrutiny issue we can look to the record below which includes the Detroit City Charter and its commentary.

[4] Language such as this is strongly indicative that the drafters of the Detroit City Charter intended for § 2-101 to serve principally as a residency requirement.

fendants in this case is not materially different from the governmental interests asserted in *Grano*, or in *Green*, the case upon which *Grano* heavily relied. As the *Grano* Court correctly held:

> "The [residency] restriction is in no way "tailored" to achieve the stated municipal goal [of ensuring familiarity with the community and the problems facing it]. It permits a two year resident of [the city] to hold public office regardless of his lack of knowledge of the governmental problems of the city. On the other hand, it excludes more recent arrivals who have had experience in local government elsewhere or who have made diligent efforts to become well acquainted with the municipality." [*Grano*, 86 Mich App at 493, quoting *Green*, 468 F2d at 885.]

Similarly, there is no reason to believe that the charter's durational residency requirements are an effective proxy for community familiarity or knowledge of the problems facing the community. Mere presence in a community is no more indicative of civic consciousness than mere presence at a crime scene is indicative of guilt. A person who has been a long term Detroit resident may be politically disengaged, lacking all knowledge of the community and its problems. By contrast, a politically and socially active resident who has lived in the community for only months may learn and know a great deal about the community and its problems in a short period. The durational residency requirements at issue here would permit the former to seek public office, but prevent the latter from doing so.[5] As noted in *Grano*, 86 Mich App at 495, "[w]e also have

---

[5] Moreover, even if I were to construe § 2-101 as distinguishing between the imposition of a durational voter registration requirement and a durational residency requirement, I would still conclude that § 2-101 is not narrowly tailored to serve the governmental interest most likely advanced by defendants. Perhaps obviously, being a registered voter is not narrowly tailored to community familiarity and engagement. It does

confidence, as expressed in [our] previous opinions, that the normal processes of our elective system will sufficiently insure that only qualified and knowledgeable candidates will gain office." Accordingly, I conclude that the charter's durational residency requirements are not narrowly tailored to serve a compelling governmental interest.

For the foregoing reasons I would conclude that the charter's durational residency requirements are unconstitutional, because they impermissibly classify Duggan and other candidates on the basis of the candidate's exercise of the fundamental right to travel. I would reverse the trial court's opinion and order that defendants place Duggan's name on the ballot.

not follow that candidates will be familiar with the community simply because they have registered to vote a year before filing for office.